Margaret Gillespie, Administratrix of Estate of Richard John Stokes, Deceased, Appellee, v. Sanitary District of Chicago, Appellant.

Gen. No. 40,340.

Heard in the third division of this court for the first district at the October term, 1938. Opinion filed June 24, 1942.

ERNST BUEHLER, THOMAS DONOVAN and WILLIAM C. OEHLSEN, all of Chicago, for appellant.

RYAN, SINNOTT & MILLER, LOUIS G. DAVIDSON and GEORGE B. CRAVEN, all of Chicago, for appellee.

MR. JUSTICE HEBEL delivered the opinion of the court.

This is an action in which plaintiff, Margaret Gillespie, administratrix of the estate of Richard John Stokes, deceased, brought suit against the defendant, The Sanitary District of Chicago, and seeks to recover judgment against defendant for the death of Richard John Stokes, resulting from injuries sustained on de-

fendant's premises. On April 28, 1936, sometime after 5:00 p.m., plaintiff's intestate, a boy almost 13 years of age, accompanied by his brother, William Stokes, almost 16 years old, and one Stanton Gendon, a classmate who was past the age of 12 years, all of whom resided in Riverside, Illinois, several miles from the scene of the accident, left their respective homes on bicycles, and having no particular destination in view, traveled in an easterly direction until they reached Harlem avenue, a main four-lane concrete road, and proceeded southerly on said Harlem avenue through the village of Stickney, crossed the Santa Fe Railroad tracks and across the Harlem avenue bridge which spans the Sanitary District channel, and proceeded a short distance south on said Harlem avenue until they came to a roadway leading from Harlem avenue to the residence of one Gasparas, who was a tenant on Lot 100, a tract of land then and now owned by the defendant and leased to Gasparas. The defendant owned all of the land on the east side of Harlem avenue from the right-of-way of the Atchison, Topeka & Santa Fe Railway on the north to the old Illinois-Michigan canal on the south. All the land owned by the Sanitary District east of Harlem avenue was vacant, unoccupied and uncultivatable except Lot 100, and during the summer months of every year was covered with weeds and wild grass.

The boys left this highway and proceeded a short distance in an easterly direction across other lands owned by the defendant but not under lease. They parked their bicycles and proceeded on foot in an easterly direction to the spoil bank adjacent to the channel of the defendant, which is about 1200 feet east of Harlem avenue, arriving there between 6:30 and 7:00 p.m.

In 1908, the defendant constructed a high tension electric line from its power house near Lockport, Illinois, to Western avenue in the city of Chicago, a distance of about 30 miles. This line consisted of nine

electric wires, which were attached to and supported by steel towers about 55 feet high and located about 350 feet apart. On these towers were attached two cross-arms; to the lower one, being about 45 feet from the ground, was attached six wires, and two wires were attached to the upper one about 50 feet from the ground. The ninth wire was attached to the extreme top of the tower about 55 feet from the ground. These nine wires were insulated at the point of attachment by porcelain insulators. On all four sides of the towers appeared in words and figures the following; "Danger 44,000 volts" and they were placed perpendicularly thereon. This electric line was constructed and maintained along and a few feet adjacent to the channel.

The decedent was a boy scout, as were his two companions, and, as a part of their boy scout activities, these boys had been practicing signaling. The day before the accident they had been down in the Boston Store, and had gone up in the observation tower and looked around the city. On the evening of the accident they planned to attend a boy scout meeting in Riverside, at which decedent's signaling was to be "passed." Decedent was to be promoted to be a first class scout within a couple of weeks, and one of the requirements of advancement was proficiency in signaling.

A gravel road runs from Harlem avenue easterly, its exact course and condition at the time of the accident being somewhat in dispute, but it appears from the photographs introduced in evidence that there was a fairly well constructed gravel road from Harlem avenue toward the tower in question. There were no signs on the road, and nothing to indicate that it ran over private property. The tracks distinguishing the most traveled part of the road turn off towards the left, leading toward the spoil banks and the power line.

After playing about the premises and the spoil bank, these boys attempted to climb the tower, referred to in this case as tower No. 3, located on the bank of the

channel and about 1,000 feet east of Harlem avenue. The deceased proceeded to climb the tower, upward through both the lower and upper cross-arms and upwards to the top of the tower, where he came in contact with the topmost wire, was electrocuted, and fell to the ground.

The deceased left him surviving William Stokes, Sr., his father, and William Stokes, his brother, who accompanied him, as his only heirs-at-law and next of kin. The case was tried before a jury and a verdict rendered against the defendant in the sum of $2,000. A motion for a new trial and in arrest of judgment having been overruled, defendant brings the case to this court, seeking a reversal of the judgment entered.

It will be well to consider the pleadings in this case. The complaint originally consisted of four counts; counts 1 and 2 charging negligence and counts 3 and 4 charging wilful and wanton conduct. At the conclusion of plaintiff's case, plaintiff dismissed counts 3 and 4, and at the conclusion of all the evidence, dismissed count 2. At the close of all the evidence, plaintiff amended the first count by striking out and dismissing subparagraphs C and D of paragraph 6 thereof, and substituting in lieu thereof the following paragraph; "carelessly and negligently failed to take precautions adequate to prevent children of tender years who might be attracted to the said tower, as aforesaid, from climbing upon the tower and coming in contact with the said wires."

Defendant answered the original complaint and denied that the electric line was so located as to be readily accessible to children or other persons traveling on said Harlem avenue; also denied that said electric line was readily and easily accessible to children or that it was attractive or alluring to children of tender years; further alleged that deceased was not in the exercise of ordinary care, did not exercise the degree of care that one of his age, intelligence, capacity, experience and discre-

tion would have exercised under the circumstances; also alleged that the decedent had notice of the character of the structure and had notice of the danger and was possessed of sufficient intelligence, capacity, experience and discretion to know and to realize that it was dangerous to climb said tower and come in contact with said high voltage wires. The answer also denied that the heirs-at-law and next of kin at and prior to the time of the accident were in the exercise of ordinary care and caution for the safety of said decedent. Defendant also denied that it was guilty of negligence in failing to insulate said wires situated as they were about 50 feet above the ground; also alleged that the deceased was fully warned of the danger by the warning signs on each tower.

After plaintiff had amended her complaint as above mentioned, defendant prepared an additional answer to plaintiff's complaint as amended, which the court permitted the defendant to file, but this additional answer was later dismissed upon plaintiff's motion.

Defendant contends, as one of the questions involved in this appeal, that while negligence and contributory negligence are ordinarily questions of fact for the jury, when the facts are admitted and all reasonable minds would agree that the defendant was not negligent or that the injury was the result of plaintiff's decedent's own negligence, the court should inform the jury by peremptory instruction; and then goes on to cite and discuss cases which deal with the alleged negligence of the defendant and contributory negligence of plaintiff's intestate in the so-called "attractive nuisance" cases. The case of *Matijevich v. Dolese & Shepard Co.*, 261 Ill. App. 498, is cited as one such case. In that case the plaintiff, an infant of the age of ten years, was injured by the explosion of one of a number of dynamite caps which plaintiff and a companion found on defendant's quarry premises, on which there was also a pool where they went for the purpose of catching frogs. The court there held that plaintiff was a trespasser and that the

element of "'attractiveness or allurement of the danger-
ous agency,'" necessary to bring the case within the so-
called attractive nuisance doctrine, was lacking in that
case. Defendant also cites in support of its theory in
this case the further cases of *Austin v. Public Service
Co. of Northern Illinois,* 299 Ill. 112; *Burns v. City of
Chicago,* 338 Ill. 89; *McDermott v. Burke,* 256 Ill. 401;
and *Follett v. Illinois Cent. R. Co.,* 288 Ill. 506.

Defendant further contends on the questions before
this court that a landowner owes no general duty to
keep his land safe for children of tender years, or even
free from hidden danger, if he has not directly or by
implication invited them there, and that infants have
no greater right to go upon other people's land than
adults, and the mere fact that they are infants imposes
no duty upon land owners to expect them and to pre-
pare for their safety. *United States Zinc & Chemical
Co. v. Britt,* 258 U. S. 268.

In reply to defendant's suggestions, plaintiff asserts
that whether defendant was guilty of maintaining an
attractive nuisance was a question of fact, which was
necessarily submitted to the jury. It is urged that de-
fendant's first point—that where all reasonable minds
would agree that the defendant was not negligent or
that the injury was the result of decedent's own negli-
gence, the question becomes one of law—is purely
academic. Plaintiff contends that the law in respect
of directed verdicts, and questions of law and fact, is
no different in attractive nuisance cases than in other
cases, that what is a question of fact in an ordinary
negligence case remains a question of fact in an attrac-
tive nuisance case; and that if a verdict could not be
directed in an ordinary negligence case, the fact that
plaintiff seeks to recover under the attractive nuisance
doctrine confers no greater powers on the trial judge.
(Citing *Deming v. City of Chicago,* 321 Ill. 341.)

The testimony as to the attractiveness of the tower,
whether decedent was, in fact, attracted by it, and
whether the defendant was negligent in the maintenance

of the structure, were all essentially fact questions, which required submission to a jury. The decedent was under 14 years of age, and under no circumstances— it is urged— can the court find a child under that age guilty of negligence as a matter of law. His alleged contributory negligence must be submitted to the jury. (*Maskaliunas v. Chicago & W. I. R. Co.*, 318 Ill. 142.) The holding in the *Maskaliunas* case has been followed in many other cases, among which are *Deming v. City of Chicago*, 321 Ill. 341, and *Hurzon v. Schmitz*, 262 Ill. App. 337.

In reply to defendant's point that a landlord owes no duty to keep his land safe for trespassers, whether infant or adult, unless they have been invited on his land directly or by implication, plaintiff contends that unguarded premises, which are supplied with dangerous attractions are regarded as holding out implied invitations to children, and that under such circumstances it is unnecessary to prove an express invitation; and children who thus come upon the premises cannot be regarded as trespassers. In the argument offered, plaintiff points out that there was no means by which the boys in the instant case might have become aware that they were trespassing on property of the Sanitary District. Access to this property was gained by a wide smooth gravel road. There was no fence or barrier, and no warning sign or notice to keep off private property. It would appear, therefore, that the towers belonging to defendant were plainly visible and indeed conspicuous from Harlem avenue; that a well-traveled road led up to them; and that there was no fence to keep trespassers off the defendant's land, but instead a wide gravel road. In *Stollery v. Cicero & P. St. Ry. Co.* 243 Ill. 290, the court said:

"Under the decisions of this State unguarded premises supplied with dangerous attractions are regarded as holding out an implied invitation to children, which will make the owner of the premises liable for injuries

to them even though the children be technical trespassers. Whether or not such premises are attractive to children is a question for the jury." Also see *City of Pekin v. McMahon*, 154 Ill. 141.

Turning to the United States Supreme Court rule in respect to attractive nuisance cases, it is contended by plaintiff in reply to defendant's contention that the United States Supreme Court has narrowed the doctrine within very definite limitations, that the United States Supreme Court rule has been repudiated by the Illinois Supreme Court, and cites *Rothschild & Co. v. Steger & Sons Piano Mfg. Co.*, 256 Ill. 196, in support thereof.

In discussing the questions before this court, it is to be observed from the facts called to our attention that the question as to whether the court should have instructed the jury to find for defendant at the close of plaintiff's case or at the close of all the evidence, and whether for failure to do so the court was in error, is a little beside the question. The court permitted the facts to be considered by the jury and the jury was instructed on the law that would govern on the facts as they appear in this record. As a result, the jury did pass upon the controversy, and the court, after passing upon the motions made, entered judgment. Under such circumstances, it is for this court to determine from the facts appearing as to whether the verdict is sustained by the evidence introduced. There is evidence in the record to the effect that the premises in question were frequently occupied by adults as well as children, and that the children would, on the occasions when they came upon the premises, indulge in games, although the evidence is not clear as to just what the adults did do. It would appear, therefore, that there was an implied invitation to decedent to come upon the land. The decedent, with his two companions, were riding their bicycles along Harlem avenue when they saw the steel towers erected on the spoil bank,

toward which ran a gravel road. The boys, being anxious to continue their boy scout signaling, appear to have been attracted to the towers as a good place of visibility to signal each other. One of the boys, William Stokes, testified that: "When we came opposite this road leading down opposite the canal bank we saw the road. It didn't look like a nice road to go down but we seen these towers. We saw them as we were entering the bridge and one of us boys said. . . . We could see these towers clearly from Harlem avenue and big banks down there. . . . We thought it was a nice place to get about half way up and signal one another." There is no question but what the boys were attracted from Harlem avenue by the steel towers which carried the high voltage wires.

The question then arises as to whether these towers were an attractive nuisance. As already indicated, they were 55 feet above the ground, with two cross arms on the top; the upper one was three feet below the top of the tower, and the lower one was five feet below the upper one. On the tower in question there were a number of arms or foot holds, commencing about six feet above the ground, by means of which access was gained to the cross arms at the top of the tower. Defendant points out that this tower was of an old type, not equipped with safeguards found on more modern installations. The ladder was brought down to within six feet from the ground, and between the ground and the bottom of the ladder there is lattice work which, instead of presenting an obstacle to a boy intent on climbing, might rather increase his zeal. One of the boys, Stanton Gendon, started up the tower first, followed by decedent, with William Stokes, decedent's brother, bringing up the rear. It appears from the evidence that they did not see the warning "danger" sign, but "climbed it from underneath; got up underneath and didn't see any writing at all." And, having thus approached the tower, they found they could easily reach the first hand

hold, and climbed up to it by making use of the lattice work in the base of the tower. From that point ascent to the top of the tower presented no difficulties. William Stokes, the last to ascend, went only half way up when he decided they had better come down. He called to them to come back, and he descended and went over to the canal bank, close by, and amused himself by throwing stones into the canal while waiting for his companions to rejoin him. He testified that he urged the others to come down because he was afraid they would fall and hurt themselves, not because he had any idea that there was danger from the wires. In the meantime, Stanton Gendon had reached the cross arms near the top of the tower. Decedent was still below him and called up to his companion, who moved over and let him go past, up toward the top of the tower. Stanton Gendon testified that decedent (Dickey) "stood up in the position I was and looked across the country. He peered around with his hands shading his eyes. . . . I seen Dickey starting to go down, put his hand over to the side of the wire so that he could get down by the lattice, then he walked where my foot was. Before I could look up again I heard this loud crash. There was an immense blue flame, a violet flame, and I couldn't see Dickey through the flame." It appears further that the "Danger, 44,000 volts" sign did not appear on each leg of the tower, nor was there such a sign on the upright to the left, the one supporting the ladder; and on the leg where the sign did appear, it was so defaced as to be almost illegible. There was no fence around the base of the tower, no trap door to prevent access to the ladder, and no warning to children except the sign placed on a portion of the tower where it would do the least good. It does appear, therefore, that the tower in question attracted the decedent and his companions from the public highway, and that the question of whether the tower was inherently attractive was properly submitted to the jury and answered by their verdict.

In *O'Donnell v. City of Chicago*, 289 Ill. App. 41, the plaintiff climbed an electric light pole to watch a boxing match which was being conducted in an enclosure near by. Defendant insisted that plaintiff was not attracted by the instrumentality which injured him, but the court held that the pole was a part of a general environment which was attractive to children and sustained a judgment for plaintiff. Again, in the case of *Ramsay v. Tuthill Bldg. Material Co.*, 295 Ill. 395, the plaintiff, who was playing on defendant's premises, went into a bin and fell down a chute where a quantity of sand fell on top of him and he was smothered. There, the defendant insisted that decedent was not attracted by the thing which caused his death, since the bin was not visible from the street. The court, however, held that it was not necessary that the instrumentality should be visible from the street, or that children should be attracted by it. The court rested its decision holding that the defendant was liable on the ground that if an owner knows that children play on his property, it is his duty to keep it reasonably safe. This holding applies in the instant case, since the evidence shows that both adults and children were accustomed to come upon the premises in question.

The instinct of a child to climb is fundamental, and if children play in the immediate neighborhood of a ladder, it would seem obvious that they would try to climb the ladder. In the instant case children had been for a long while playing in the vicinity of the tower in question, and the defendant reasonably should have expected that at any time, due to the construction of the tower, an accident similar to one in the instant case might have happened. In *Stedwell v. City of Chicago*, 297 Ill. 486, the evidence was that children played "around these pillars." This evidence was held sufficient to authorize submission to the jury of the question of notice to defendant.

Upon all the facts appearing in the record, we are of the opinion that the court was justified in permitting

the case to go to the jury. Upon the question of decedent being a trespasser, it appears that there was no warning sign on the roadway leading toward the tower in question indicating that it was private property, except a sign ''private road'' erected by George Gasparas which was placed on a road which led down to the Gasparas home, and which was not on or near the road by which the boys gained access to the tower. As before stated the towers were plainly visible from Harlem avenue and were a conspicuous feature of the landscape; there was a well-traveled road leading up toward them; and there was no sign of warning, and children were in the habit of playing near the towers. There was no fence to keep trespassers off, but instead of a fence there was a wide gravel road. Therefore, it does seem reasonable that defendant did by implication invite children to come upon the premises, including decedent in the instant case. Upon a question of like character, the Illinois Supreme Court, in the case of *City of Pekin v. McMahon,* 154 Ill. 141, said:

''Although a child of tender years, who meets with an injury upon the premises of a private owner, may be a technical trespasser, yet the owner may be liable, if the things causing the injury have been left exposed and unguarded, and are of such a character as to be an attraction to the child, appealing to his childish curiosity and instincts. Unguarded premises, which are thus supplied with dangerous attractions, are regarded as holding out implied invitations to such children. 'The owner of land, where children are allowed or accustomed to play, particularly if it is unfenced, must use ordinary care to keep it in safe condition; for they being without judgment and likely to be drawn by childish curiosity into places of danger, are not to be classed with trespassers, idlers and mere licensees.' (2 Shear. & Red. on Neg. — 4 ed. — sec. 705; 4 Am. & Eng. Enc. of Law, page 53, and cases in note.) In such case, the owner should reasonably anticipate the injury which has happened.''

418

Upon consideration of the questions involved and of the authorities called to our attention, we have reached the conclusion that the court properly submitted the questions involved to the jury, and that the court was justified under the facts in entering judgment on the verdict. The judgment is, therefore, affirmed.

*Affirmed.*

BURKE, P. J., and KILEY, J., concur.